**Dollie KOHRS, Appellant,**

v.

**Arthur S. FLEMMING, as Secretary of Health, Education and Welfare of the United States of America, Appellee.**
**No. 16292.**

United States Court of Appeals
Eighth Circuit.

Dec. 18, 1959.

James R. McGreevy, Omaha, Neb., Edwin Cassem, of Cassem, Tierney, Adams & Henatsch, Omaha, Neb., on the brief, for appellant.

Thomas J. Skutt, Asst. U. S. Atty., Omaha, Neb., for appellee.

Before GARDNER, WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Dollie Kohrs, plaintiff-appellant, brought this action in the District Court of the United States for the District of Nebraska to review, in accordance with the provisions of 42 U.S.C.A. § 405(g), an order of the Secretary of Health, Education, and Welfare denying to her disability benefits. Plaintiff first filed her application with the Bureau of Old Age and Survivors Insurance of the Social Security Administration on April 25, 1955, to establish a period of disability under 42 U.S.C.A. § 416(i), which section defines "disability" to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." On June 4, 1956, her

application was denied on the grounds that her impairment did not preclude her from engaging in "any substantial gainful activity". Upon her request for reconsideration, the Bureau affirmed its earlier finding. Plaintiff then requested a hearing before a referee of the Social Security Administration, which hearing was held on May 1, 1958. On May 28, 1958, the referee concurred in the Bureau's conclusion and denied her request for benefits. Plaintiff appealed to the Appeals Council of the Social Security Administration. On October 8, 1958, the Council denied her request for review of the referee's decision because it was of the opinion that a formal review would result in no advantage to her. Thereafter, plaintiff brought suit in the United States District Court for the District of Nebraska to obtain a judgment reversing the decision of the referee which had become the final decision of the Secretary. In the District Court both parties moved for summary judgment. The court granted the Secretary's motion and denied that of the plaintiff. Plaintiff then moved for reversal or in the alternative for a new hearing before the referee. This motion was also denied. Plaintiff appeals here both from the judgment and from the denial of her motion.

The primary question is whether or not the finding of the Secretary to the effect that the plaintiff is able to engage in a substantial gainful activity is supported by substantial evidence. The evidentiary facts do not appear in serious dispute. It is the ultimate conclusion to be drawn therefrom which causes the difficulty. Plaintiff is a single woman who became 60 years of age on August 10, 1959. She has an eighth-grade education. For approximately 20 years she worked as a practical nurse in a doctor's office. Thereafter she was employed as a food packager by the Skinner Manufacturing Company in Omaha, Nebraska, for whom she worked a year and a half until she became disabled. Her employer subsequently reported to the Social Security Administration that "Dollie Kohrs became crippled in one arm and was unable

to do the work assigned to her, therefore, her employment was terminated". She has engaged in no gainful activity since April 24, 1948, and claims to be disabled within the purview of the statute.

Plaintiff's condition originated from an injury occurring in 1947 when she fell and alighted on her left arm and shoulder. Initially the injury did not appear particularly severe but shortly thereafter serious complications occurred. Plaintiff was first attended by Dr. Harry Jenkins of Omaha, Nebraska, who recommended that she carry her arm in a sling and advised her that an operation was necessary. He performed the first of a series of operations on the scalenus in the neck. After the operation, Dr. Jenkins referred her to Dr. James Martin, also of Omaha. Dr. Martin examined her in September of 1948. His advice was that, " * * * if it was his arm he would amputate it". Plaintiff then returned to Dr. Jenkins, who recommended that she see Dr. Arthur Steindler, head of the Department of Orthopedic Surgery at the University of Iowa. Dr. Steindler performed an operation on her left side known as a scalenus anticus-resection. Subsequently Dr. Steindler performed another operation consisting of a flexor-plasty, or a transplantation of the tendons and muscles, of the left forearm which resulted in the restoration of some strength and mobility in her arm but did not relieve the pain in her left shoulder. Plaintiff's next operation was an arthrodesis of the left shoulder joint by Dr. Steindler in July, 1949, which procedure consists of a bony fusion and fixation of the shoulder joint to make it stiff and immovable. Plaintiff's last operation was at the University of Nebraska, where she had become a charity patient upon the exhaustion of her savings. There, on August 23, 1951, plaintiff again had an intra-articular arthrodesis of the left shoulder joint under general anesthesia and a shoulder spica cast was applied. This operation was necessary because plaintiff's arm was again out of joint at the shoulder and hung free with no control. She has undergone repeated hospitalizations and constant medical care up to the present time.

At the time of the hearing the plaintiff was carrying her left arm in an adduction brace prescribed by Dr. Richard Smith, staff doctor at the University of Nebraska Medical Hospital, which held her forearm at an angle of approximately 75° and which was necessary to relieve pain. She has used this brace since January, 1952, putting it on at around four or five o'clock in the afternoon and wear it through the night and taking it off in the mornings. When she leaves the house she puts the brace on because it is painful to walk without it. When she is not wearing it her arm does not hang normally at her left side but extends out in almost the same position it assumes when supported by the brace. Without the brace plaintiff would be unable to sleep.

Plaintiff continues to suffer great pain in her left arm and shoulder. She testified, in answer to the question whether or not she was able to accept gainful employment, "No. I don't think I am" and, "Well, because the arm is extremely painful even when I am out of the brace as well as when I am in the brace. The brace is very uncomfortable to wear. Sitting is a great difficulty", and, "Well, I don't think that I would be able to undertake any work of any kind because of the difficulty of the brace and the pain in my forearm." The record further shows the following:

"Q. Do you think that you could or could not have undertaken any type of gainful work during any period from April 1948 up to now?

A. No, I don't think I could have. The biggest part of the time I was in a cast.

"Q. Can you estimate the approximate length of time that you where in various plaster casts?

A. Well, I know I was in the first plaster cast about four weeks, and then the next time I was in a cast three months, and then I wore the

brace, and the last time I was in a cast practically six months.

"Q. Then how long a period approximately did you wear the waist type of brace?

"A. Well, this brace I have worn since 1952."

During the period of her disability plaintiff on several occasions visited a rehabilitation center in an attempt to obtain help. Such attempts were unavailing. Beginning September, 1956, plaintiff applied for and was held eligible for "Aid to the Disabled" from the Douglas County Welfare Agency which entitled her to $53.20 per month. In 1949 the Prudential Insurance Company of America recognized plaintiff's condition as one of total disability entitling her to payment under each of two policies producing aggregate benefits of $9.37 per month.

Dr. R. D. Schrock, head of the Department of Orthopedic Surgery of the University of Nebraska College of Medicine, reported to the referee:

"6. Progress

"(a) Is condition static? (a) Yes

"(b) If not, what optimum improvement can be expected, if any?
  (b) None. Unable to return to work as a nurse and trained in no other line of activity.

"(c) When?     6 Months........
                1 Year..........
                Indefinite........

"(d) Have you advised applicant not to work? (d) Field of employment limited to what could be accomplished with her right hand."

Under "Remarks", he stated:

"Miss Kohrs is now 58 years of age. This left upper extremity can be utilized for only the lightest type of work that would require marked limitation in the range of motion of the hand as well as marked weakness in this left hand. She apparently has applied for rehabilitation services and has not been accepted. The field of activity in which she could be retrained would be sharply limited. She certainly is unable to return to her profession as a nurse. *In my opinion, she is totally disabled.*" (Emphasis supplied.)

The referee, following the hearing of May 1, 1958, concluded that:

"The medical evidence establishes that this claimant has lost the use of her left arm. She also suffers from some pain; however, it apparently is not so severe that it is necessary that a cervical cordotomy be performed. In this connection, it will be noted that the Committee Report is to the effect that an individual would not meet the definition of disability if he could with safety to himself achieve reduction of the symptoms. The physical condition of the claimant at the time she last met the eligibility standards, March 31, 1950, has not been clearly established. Dr. Steindler who saw claimant in December 1949, three and a half months before this date, stated that there was good fusion of the left shoulder. Report from the University of Nebraska Hospital stating that claimant was hospitalized and operated on in August 1951, would indicate that the shoulder did not properly fuse in 1949. The referee finds that the claimant prior to March 31, 1950, lost the use of her left arm and that such loss was permanent. The regulations provide that whether or not an impairment in a particular case constitutes a disability, must be determined on the facts of the particular case. One of the impairments which would ordinarily be considered as preventing substantial gainful activity, would be the loss of two limbs. In the instant case, the claimant has suffered the loss of the use of her left arm. She appears to be a woman of above average intelligence. For twenty years she worked as a practical nurse for a doctor. While the loss of the use of the one arm would limit claimant's activi-

ties, there are many people of claimant's background who have lost the use of one arm and who are able to engage in substantial gainful activity."

The referee's conclusion that plaintiff's pain was not so severe that a cervical cordotomy was necessary was based upon a letter from Dr. Kenneth M. Brown, a neurological surgeon, in which he reported that:

" 'It is my feeling that the patient has several related but separate disabilities. Firstly, she has marked weakness in the proximal portion of the left arm secondary to a scalenus anticus operation. Secondly she has pain apparently from the region of the left shoulder joint which has been improved, but not satisfactorily relieved by arthrodesis and braces. Thirdly, she has probably a traumatic neuritis of the C6 nerve root or of that portion of the brachial plerus carrying these fibers. The cervical spine films show hypertasis and clipping at C5–6. There is a possibility of a cervical disc or compression of C6 by arthritis spurs, but even if this pain were relieved, her shoulder pain would likely persist since it seems to be definitely related to the shoulder joint.

" 'My only suggestion relates to relief of pain. If and when the pain factor is such that a major neurological procedure is warranted, a high cervical cordotomy, unilaterally could be done. The mortality risk and morbidity are not so great as to justify withholding the procedure if the patient's main disability remains to be pain, unrelieved by conservative care. The patient must decide herself how severe her pain is, and how long she is willing to try various conservative measures.' "

■ Dr. John E. Courtney, who has engaged in the practice of general surgery in Omaha, Nebraska, for 29 years, explained in an affidavit filed in support of plaintiff's motion in the District Court that a cervical cordotomy is a relatively rarely used procedure performed to alleviate pain resulting from cancer and other incurable diseases. It is recommended only where the pain is excruciating and cannot be controlled by drugs, etc. The surgical technique is risky because of the danger of severing nerve fibers which should not be cut. The result of such surgery in the instant case would be to render plaintiff's arm dead to all sensation. Thus, a cordotomy is a procedure to relieve pain and not disability. Loss of function would be increased thereby. In effect, the referee held that because the plaintiff is unwilling to submit to such an operation she may not be considered "disabled". In the light of the questionable nature of that procedure, we believe such conclusion to be insupportable.

■ In arriving at his decision, the referee also stated:

"In connection with the enactment of the Social Security Act Amendments of 1954, which provided for the establishment of a period of disability, Congress made it quite clear that the disability provisions of the Act were to be strictly construed. See [1] attached. In accordance with the Congressional Committee suggestion, *standards of evaluating severity of disabling conditions have been set up.* These were published in the Code of Federal Regulations, paragraph 404.1501. *Part of the Regulation states: 'Examples of some impairments which would ordinarily be considered as preventing substantial gainful activity, are * * * (1) Loss of use of two limbs * * *.'*

"It thus seems clear that the Congress has adopted as the standard of 'disability' the requirement that the person be unable to engage in any substantial gainful activity including not only his previous occupation but any other occupation in which he might be employable considering the circumstances of his education, age, work experience, and physical and mental capacities.

Moreover, the causal connection between any existing unemployment and the impairment must be clearly established.

" * * * It must be demonstrated that the nature of the physical condition is such that the individual cannot work in *any* of the various occupations existing in our economy which his background and education made it possible for him to perform and this disability must be medically determinable." (Emphasis supplied.)

Thus, it would seem that the referee additionally required loss of the use of two limbs before he would determine that the claimant could not engage in *any* gainful activity. We do not think it was the intention of Congress to have the Secretary create inflexible formulae for the determination of "disability" within the meaning of the statute. To do so would be both inequitable and harsh. Of course, it would be unrealistic not to recognize the fact that many persons who have but one limb are able to and do engage in substantial gainful activities. But it would be equally unrealistic to fail to find statutory disability where the loss of the use of one limb has resulted in continuous pain and discomfort, the need for an awkward brace, the termination of employment, and the inability to work at anything for which one has been trained.

■ Plaintiff was discharged from her job packaging foods because she was unable to perform the work. She has complete loss of the use of her left arm and shoulder. She is in constant pain. She wears a brace which holds her arm in an extended position out from her body in order to alleviate her pain in some degree. She has applied for rehabilitation services without avail. Certainly she could not return to her earlier employment as a practical nurse. The Secretary does not suggest what such a person could do to "engage in any substantial gainful activity", nor can we. We quite agree with Chief Judge Biggs of the 3rd Circuit, who, being specially designated to try a similar matter in the District Court, stated in Klimaszewski v. Flemming, D.C.E.D.Pa.1959, 176 F.Supp. 927, 932, wherein he was dealing with an almost identical problem:

"The word 'any' must be read in the light of what is reasonably possible, not what is conceivable. The statute must be given a reasonable interpretation. It is a remedial statute and must be construed liberally. It was not the intention of Congress to impose a test so severe as that required by the Secretary and to exact as a condition precedent to the maintenance of a claim the elimination of every possibility of gainful employment."

See also, Lewis v. Flemming, D.C.E.D. Ark.1959, 176 F.Supp. 872; Adams v. Flemming, D.C.Vt.1959, 173 F.Supp. 873; Aaron v. Fleming, D.C.Ala.1958, 168 F. Supp. 291; Dunn v. Folsom, D.C.Ark. 1958, 166 F.Supp. 44.

■ The medical opinion of the head of the Department of Orthopedics at the University of Nebraska that "in my opinion she is totally disabled" was in nowise contradicted, either by other medical testimony, opinion or fact. The opinion of an expert witness is, of course, advisory, but as was stated in Hill v. Fleming, D. C.Pa.1958, 169 F.Supp. 240, 245, where the court was faced with a similar problem:

"Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation'.[5] "

"[5] National Labor Relations Board v. Columbian Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. International Brotherhood, 8 Cir., 1952, 196 F.2d 1, 4; National Labor Relations Board v. Amalgamated Meat Cutters, 9 Cir., 1953, 202 F.2d

671, 673. Cf. Dickinson v. United States, 346 U.S. 389, 397, 74 S.Ct. 152, 98 L.Ed. 132."

We conclude that the finding of the Secretary is not supported by substantial evidence and must be set aside and that all the credible evidence in the record establishes the plaintiff's disability within the meaning of the statute. It is ordered that the summary judgment entered by the District Court be set aside and the case remanded with instructions to grant plaintiff's motion for summary judgment.